## STATE *v.* K. W. MORSE.

### November Term, 1910.

Present: ROWELL, C. J., MUNSON, WATSON, HASELTON, AND POWERS, JJ.

#### Opinion filed May 8, 1911.

*Police Power—Function of Legislature and Courts—Protection of Public Health—Municipal Water Supply—Order of Board of Health—Validity—Presumptions—Boatable Ponds —Rights of Riparian Owners—Bathing—Judicial Notice.*

Where the State Board of Health reported to a city that the boatable pond whence it obtained its water supply was in constant danger of serious pollution, and that, pending suggested improvements, the Board would publish an order forbidding any person to bathe in the pond, which order, on June 24, 1903, the Board caused to be duly published under the provisions of No. 115, Acts 1902, although the Board expected that the city would make the suggested improvements within a reasonable time, that did not confine the prohibition of the order to such reasonable time, and a riparian proprietor who bathed in the pond on August 1, 1909, was liable to prosecution for violation of the order, notwithstanding the city had not made the suggested improvements, and regardless of whether he knew that the order had been made and published, and regardless of whether the Board ignored sources of pollution that were more serious than bathing.

The failure to comply with the requirement of §3, No. 115, Acts 1902, providing that an affidavit of the persons causing the required publishing or posting of an order of the State Board of Health, issued for the protection of a water supply, shall be recorded in the office of the municipality where the order is to take effect, in no way affects the legality of the notice, as that requirement is only for the purpose of evidence.

Though the right of a riparian owner to the reasonable use of the water

of a boatable pond is a property right, yet it is a right incident to the ownership of the land—the water going with the land, and not the land with the water.

A riparian owner's reasonable use of the water of a pond that feeds a stream is limited, among other things, by the rightful use made of the water by lower riparian owners; and a riparian owner is not making a reasonable use of his incidental right to bathe in the water of a pond whence a city obtains its water supply if thereby that supply is so contaminated as to endanger, or really threaten to endanger, the health of the community, and, therefore, the general prohibition by the State Board of Health of bathing in such pond, in those circumstances, without compensation to the riparian owners, is not such a "taking" of their property as is forbidden by the Constitution, but is a legitimate exercise of the police power of the State.

A person's possession and enjoyment of any right, even that of liberty itself, are subject to such reasonable regulations and restraints as are essential to the protection of the morals, health, safety, and welfare of the community.

The protection of the morals, health, safety, and welfare of the community is the proper function of the police power of the State, and that power, together with a wide though reasonable discretion as to the necessity and manner of its exercise in particular conditions, inheres in the Legislature, which may lawfully delegate it to municipalities or State boards.

It is, primarily, for the Legislature to determine what measures are necessary and appropriate for the protection of the morals, health, or safety of the community, but to be lawful those measures must in a reasonable degree tend to accomplish that result, and so, ultimately, the question of the validity of those measures is for the courts, which, however, have nothing to do with the wisdom or expediency of the measures.

The courts look with favor on regulations for the protection of the public health, and make every reasonable presumption and intendment to sustain them.

Judicial notice is taken of the germ theory of disease, and that the human body may give off germs dangerous to public health, and that should those germs, through bathing in a pond whence a city obtains its water supply, reach the intake of that supply they might spread contagion and disaster throughout the city.

INFORMATION for bathing in Berlin Pond in violation of an order of the State Board of Health. Trial by jury waived, and trial by court on an agreed statement of facts, at the September Term, 1910, Washington County, *Hall* J., presiding. The respondent, *pro forma*, adjudged guilty and fined. The respondent excepted. The opinion states the case.

*Richard A. Hoar* for the respondent.

Berlin Pond is an inland body of water, and the shore ownership carries with it, unless expressly reserved, ownership to the center of the lake. *Grand Rapids Ice Co.* v. *S. G. R. Ice Co.,* 102 Mich. 236; *People* v. *Hulbert,* 131 Mich. 156.

Under the guise of the police power the city of Montpelier is unlawfully attempting to get for nothing a valuable property right of riparian owners in Berlin Pond. Police power is a regulation, not a taking, and not a confiscation; and the moment the act passes beyond mere regulation, and attempts to deprive the individual of his property under pretence of regulation, then the act becomes one of eminent domain, and is subject to the obligations and limitations which attend an exercise of that power. *Barre Water Co.* v. *Carnes et al.,* 65 Vt. 626; *In re Barre Water Co.,* 62 Vt. 27; *Snow* v. *Sandgate,* 66 Vt. 451; *Re Chessbrough,* 78 N. Y. 232; *Grand Rapids* v. *Power Co.,* 89 Mich. 94; *Sanbourn* v. *People's Ice Co.,* 82 Minn. 43.

A riparian proprietor on this lake or pond had a right to the use of the water of this lake as it comes to him, for domestic, agricultural, pleasure, and manufacturing purposes, with due regard to the improvements of the day in hydraulics, and due regard to the like use by other riparians above and below him. *Gould* on *Waters,* Pt. 2 Chap. 6; *People* v. *Hulbert,* 131 Mich. 156; *Barre Water Co.* v. *Carnes et al.,* 65 Vt. 626. The riparian proprietor has the right to bathe or swim in the water on, over, and opposite his land and premises. *Gould* v. *Hudson River Co.,* 6 N. Y. 551; *Stevens* v. *Paterson etc. Co.,* 34 N. J. L. 532; Lewis Em. Dom. Ed. 1888, §79, p. 85.

Any injury to the property of an individual which deprives the owner of the ordinary use of it, is equivalent to the taking, and entitles him to compensation. Cooley, Const. Lim. 675; *Forester* v. *Scott,* 136 N. Y. 584; *People* v. *Hulbert,* 131 Mich. 156.

*Benjamin Gates, State's Attorney,* for the State.

POWERS, J. The respondent was prosecuted for bathing in the waters of Berlin Pond in violation of a regulation of the State Board of Health. An agreed statement of facts was filed in

the court below, from which it appears that Berlin Pond is a natural body of boatable water lying in the town of Berlin, which town adjoins the city of Montpelier. It has an area of about three hundred and sixty acres. The city of Montpelier takes its water supply from this pond,—its intake pipe being located in the brook which forms the outlet, at a point some two miles below the pond. This water system has been in operation over twenty years. The shore of the pond is owned by various parties,—one of which is the city of Montpelier— and is occupied in part by summer cottagers and pleasure-resort proprietors.

The respondent, at the time in question, was the lessee of a certain cottage and the land connected therewith, which land lay along and included a part of the shore of the pond. It appears that the State Board of Health, had, at the request of the common council of the city, made an examination of the conditions surrounding Berlin Pond, and had reported those conditions as found together with its conclusions thereon,—to the effect that the water supply of the city was in constant danger of such pollution as might at any time result in serious disaster to the city. Two remedies were suggested: One, the protection of the pond and its tributaries from pollution; the other, the adoption of some method of purification. The latter was advised. After making some suggestions regarding the expense of the establishment of a filtration plant, the communication which the Board sent to the council, continues: "Pending action on this suggestion, and until you can have a filtration plant in operation, * * * this Board * * * would make and publish the following orders, rules and regulations. * * * ". These regulations were forwarded June 24, 1903, and on the 27th were posted in the three public places in the town of Berlin, there being no newspaper published in that town. This action of the Board was taken under No. 115, Acts of 1902. One of the regulations, so promulgated, provided that no person should bathe or swim in Berlin Pond or its tributaries or outlet. On August 1, 1909, the respondent entered the waters of the pond opposite the premises occupied by him as above stated and swam about therein.

Upon these facts, the court below *pro forma* adjudged the

respondent guilty and sentenced him to pay a fine and costs. To this judgment the respondent excepted.

It was conceded below that the respondent could, if permitted, show that the city of Montpelier had never built a filtration plant as suggested by the Board; and it is argued that the posting of the pond was provisional and temporary, merely; that the effect of the action taken was to give the city a reasonable time within which to install such plant, during which time it would have the benefit of the protection afforded by the regulations, but at the expiration of which the legal force thereof would be spent,—the city having forfeited their right to protection by their own neglect. And it is insisted that a reasonable time has long since elapsed, and therefore the prohibition was no longer in force and the riparian owners were restored to all their former rights and privileges, though the posters· may have remained in place.

We cannot adopt this view. Though it appears to have been the expectation of the Board that the city would undertake to install a filtration plant in accordance with the recommendation, in no fair sense was its official action conditioned upon such undertaking. If the question was one between the Board and the city as a municipality, there would be some force in this argument. But this is not a matter *inter partes*; the order was not made for the benefit of the city in its corporate capacity, but for the protection of the people of the community both individually and collectively; indeed the benefit of the order was not to be confined to those who dwelt within the borders of the city, but was to be available to all who might be temporarily therein or otherwise brought into contact with its people.

And there is no advantage to the respondent in the other concession that he would, if allowed, testify that he did not know that the pond was posted. The requirements of the statute were sufficiently complied with and no actual notice was necessary. Nor was it necessary for a member of the Board actually to erect the notice; this might properly be entrusted to another. Nor did the omission to file the affidavit specified by section 3 of the act referred to affect the legality of the

notice. That requirement was obviously for the purpose of evidence only.

Equally without merit is the suggestion that conditions are shown to be such that other sources of contamination exist, left untouched by the regulations of the Board, more serious than those here involved. The fact that. others are befouling these waters affords no excuse or defense to the respondent. *Indianapolis Water Co.* v. *Am. Strawboard Co.*, 57 Fed. 1000; *Baltimore* v. *Warren Mfg. Co.*, 59 Md. 96.

Coming now to the more serious and important question in the case—the validity of the regulation—the position of the respondent is that it is utterly invalid and void, for to give effect to it .would be to deprive him of his property without compensation and without due process, contrary to the guaranties of the organic law.

The respondent relies much upon *People* v. *Hulbert*, 131 Mich. 156, 100 Am. St. Rep. 588, 91 N. W. 211, 64 L. R. A. 265, a case in its facts surprisingly like the case in hand. There, as here, one was convicted of bathing in the waters of a pond or lake from which a city took its water supply. A statute made it a criminal offence to pollute such waters. The respondent stood as a riparian owner. The court held that as such owner he had a right to a reasonable use of the waters of the lake, that such use included the right to bathe and swim therein; and that this reasonable use could not be taken away by the police power of the state. With the conclusion reached in that case we cannot agree. That a riparian owner has a right to the reasonable use of the water of such a pond, we agree; that this ordinarily carries the right to bathe and swim therein, we agree; that this right is a property right, we agree. This right is an incident to the ownership of the land. It is to be observed, however, that it is not primary, but incidental. The land is the principal, the water the incident. In other words, the water goes with the land, and not the land with the water. *Avery* v. *Vt. Elec. Co.*, 75 Vt. at p. 242, 54 Atl. 179, 59 L. R. A. 817, 98 Am. St. Rep. 818. Can it be said that it is always and under all circumstances a reasonable use of such waters to bathe therein? Reasonable use varies with circumstances; it depends among other things, upon what use is made of the

water by the lower owners, whose equal rights must be respected. *Laurie* v. *Silsby*, 82 Vt. 505, 74 Atl. 94. If bathing in a pond from which a city takes its water supply contaminates, or in circumstances reasonably to be apprehended may contaminate such waters, thereby endangering the health of the community, can it then be said that the riparian owner is making a reasonable use of his incidental right? The answer must be negative. Such use in such circumstances may be prohibited in a valid exercise of the police power. The owner's rights are not then "taken" in a constitutional sense; or, if this statement savors too much of refinement of reasoning, as some suggest, the "taking" is not such as the Constitution prohibits. The beneficial use of the property is curtailed in some measure but all the other incidents of ownership are left unimpaired. The fact that this is a property right does not determine the question. There remains the question whether the promulgation and enforcement of the regulation is a legitimate exercise of the police power. For, as we suppose everyone now agrees, the possession and enjoyment by the individual of all his rights, even that of liberty itself, are subject to such reasonable regulations and restraints as are essential to the preservation of the health, safety and welfare of the community. The proposition is well stated in Wood, Nuisances, (3rd Ed.) §1: "It is a part of the great social compact to which every person is a party—a fundamental and essential principle in every civilized community—that every person yields a portion of his right of absolute dominion and use of his own property in recognition of an obedience to the rights of others, so that others may also enjoy their property without unreasonable hurt or hinderance." It follows, then, that whenever any of the rights of the individual come into conflict with those of the public which concern the interests named, the former must yield and the latter prevail.

The enforcement and protection of these paramount rights is the proper function of the police power. This power inheres in the governing body—the Legislature. There it abides, and with it of necessity goes a wide, though reasonable discretion as to the necessity and manner of its application to particular conditions. The power may lawfully be delegated

to municipalities, to local or to state boards—*Board of Health* v. *St. Johnsbury*, 82 Vt. 276, 73 Atl. 581, 23 L. R. A. (N. S.) 766; *Chicago* v. *Hotel Co.*, (Ill.) 93 N. E. 753; *State* v. *Diamond Mills Paper Co.*, (N. J.) 51 Atl. 1019, affrmd., 53 Atl. 1125; *Rossberg* v. *State*, 111 Md. 394, 74 Atl. 581, 134 Am. St. Rep. 626,—and when so delegated the agency employed is clothed with power to act, as full and efficient as that possessed by the Legislature itself. From the fact that this power resides in the legislative branch of the government, it follows that it is for that department to determine, primarily, what measures are necessary and appropriate for the protection of the public morals, health or safety. *Mugler* v. *Kansas*, 123 U. S. 623, 31 L. Ed. 205, 8 Sup. Ct. 273. But these measures in order to be lawful, must, in some reasonable degree, tend to the accomplishment of such result. *People* v. *Murphy*, 195 N. Y. 126, 88 N. E. 17, 21 L. R. A. (N. S.) 735; *Ex parte Quarg*, 149 Cal. 79, 84 Pac. 766, 5 L. R. A. (N. S.) 183, 117 Am. St. Rep. 115, and therefore, in its last analysis, the question of the validity of such measures is one for the court. *State* v. *Speyer*, 67 Vt. 502, 32 Atl. 476, 29 L. R. A. 573, 48 Am. St. Rep. 832. But with the wisdom or expediency of such measures, the court has nothing to do. If a law or a regulation (to use the language of Mr. Justice Harlan in *Mugler* v. *Kansas*) "has no real or substantial relation to those objects or is a palpable invasion of rights secured by the fundamental law, it is the duty of the courts to so adjudge, and thereby give effect to the Constitution." When the Legislature, in a matter affecting the public health, adopts means and methods which are reasonable and appropriate, not oppressive or discriminating, constitutional limitations are not transgressed. *Lawrence* v. *Rutland R. R. Co.*, 80 Vt. 370, 67 Atl. 1091, 15 L. R. A. (N. S.) 350; *Board of Health* v. *St. Johnsbury, supra*; *Orient Ins. Co.* v. *Daggs*, 172 U. S. 557, 43 L. Ed. 552, 19 Sup. Ct. 281. But when the Legislature or its delegate exceed these bounds individual rights are invaded and the attempted regulations are void. *State* v. *Speyer*, 67 Vt. 502, 32 Atl. 476, 29 L. R. A. 573, 48 Am. St. Rep. 832. Regulations for the protection of the public health are looked upon with favor. *State* v. *Aberdeen*, 58 Wash. 562, 109 Pac. 379. Every reasonable presumption is made in favor of their

validity and "every intendment is indulged to sustain them,"
—Cooley Const. Lim. 721—and the burden is on him who
asserts their illegality. *People* v. *Board of Health,* 140 N. Y.
1, 35 N. E. 320, 23 L. R. A. 481, 37 Am. St. Rep. 522;
*Miles City* v. *Board of Health,* (Mont.) 102 Pac. 696, 25 L. R.
A. (N. S.) 589; *Bonnett* v. *Vallier,* 136 Wis. 193, 116 N. W.
885, 17 L. R. A. 486, 128 Am. St. Rep. 1061; *Mugler* v. *Kansas,
supra; Sinking Fund Cases,* 99 U. S. 718, 25 L. Ed. 501; *State*
v. *Moore,* (N. C.) 10 S. E. 143, 17 Am. St. Rep. 696. This
presumption attaches to each element essential to their validity.
So their reasonableness is presumed. *City of Butte* v. *Paltro-
vitch,* 30 Mont. 18, 75 Pac. 521, 104 Am. St. Rep. 698. We
are aware that it is sometimes said that it must appear that
the regulation tends in some degree to conserve the public
interests. It was, in effect, so said in the course of the discus-
sion in *Horwich* v. *Walker-Gordon Laboratory Co.,* 205 Ill. 497,
68 N. E. 938, 98 Am. St. Rep. 254, and in *Frank L. Fisher Co.*
v. *Woods,* 187 N. Y. 90, 79 N. E. 836, 12 L. R. A. (N. S.) 707.
But a more accurate statement of the rule is found in *People*
v. *Smith,* 108 Mich. 527, 66 N. W. 382, 32 L. R. A. 853, 62
Am. St. Rep. 715, wherein it is said that if the Legislature
has enacted a regulation for the benefit of the public or some
general class thereof, and the regulation is assailed as an un-
necessary or unreasonable interference with property rights
or with the right to contract, the presumption is in favor
of the validity of the legislative action, and unless some
plain provision of the Constitution has been violated or it
can be said that the regulation is not within the rule of
necessity in view of facts of which judicial notice may be
taken, the statute must be sustained; and in *State* v. *Hol-
comb,* 68 Ia. 107, 26 N. W. 33, 56 Am. Rep. 853, where it is
said that before an ordinance or regulation of a board of health
can be said to be unreasonable, it should clearly so appear;
and in *Rochester* v. *Macauley-Fien Milling Co.,* 199 N. Y. 207,
92 N. E. 641, where a smoke ordinance was under considera-
tion and the court said, "The common council is thus to judge
as to what ordinances it will pass for the safety and welfare
of the inhabitants of the city and the protection and security
of their property, and unless an ordinance passed by it is wholly

arbitrary and unreasonable, it should be upheld. The necessity and advisability of the ordinance are for the legislative power to determine. The presumption is in favor of the ordinance."

Such is the rule of this Court, for it was said in *Board of Health* v. *St. Johnsbury*, 82 Vt. 276, 73 Atl. 581, 23 L. R. A. (N. S.) 766, in effect, that unless a statute was palpably in conflict with the Constitution, State or Federal, or it could be confidently asserted that the means prescribed by it had no just relation to the protection of the public health, it must be sustained.

Without attempting to cover the whole range of judicial utterance on this subject, we select the following cases which fairly illustrate the trend of judicial decisions and show the extent to which the application of the doctrine is carried.

*St. Louis* v. *Galt,* (Mo.) 77 S. W. 876, 63 L. R. A. 778, was a prosecution for violation of an ordinance which made it a misdemeanor for one to allow a growth of weeds to stand upon his land. The defence was predicated upon the claim that the oridnance was an attempted invasion of constitutional rights of property. But the court sustained the conviction, saying, among other things: "A man may be willing to run the risk of disease by permitting his premises to be in an unsanitary condition, but he has no right to subject his neighbor to such risk.   *   *   *   The power to prevent nuisances—to provide for the general health—is as broad as the necessity for its exercise."

In *Laurel Hill Cemetery* v. *San Francisco*, 152 Cal. 464, 93 Pac. 70, 27 L. R. A. (N. S.) 260, 14 Ann. Cas. 1080, it was held that an ordinance, which had the effect of prohibiting further interments in existing cemeteries situated in densely populated portions of the municipality, was a reasonable and valid exercise of the police power; and the fact that this particular cemetery, on account of the nature of the soil, might not be detrimental to the public health, did not affect the validity of the ordinance. It is to be noted that when this cemetery was established it was wholly without the limits of the city and at least two miles from the business part of the city and one mile from the residence part thereof. The lands embraced within its limits —160 acres—were publicly dedicated to cem-

etery purposes; the owners expended large sums of money in preparing and adorning it; a considerable area remained unsold at the time the ordinance was adopted.   Upon full consideration, the ordinance was upheld, the court saying in part:   "But while the action of a legislative body in assuming to exercise the police power is always subject to review by the courts, the question of the expediency or necessity of a proposed re-striction is primarily for the Legislature, and the courts will not interfere with the exercise of the legislative discretion unless it clearly appears that such discretion has been arbitrarily or unreasonably exercised."

In affirming this judgment of the California supreme court, Mr. Justice Holmes said:   "If every member of this bench clearly agreed that burying grounds were centers of safety, and thought the board of supervisors  and the supreme court of California wholly wrong, it would not dispose of the case. There are other things to be considered.   Opinion still may be divided, and if, on the hypothesis that the danger is real, the ordinance would be valid, we   should not over-throw it merely because of our adherence to the other belief.   *   *   * And yet again, the extent to which legislation may modify and restrict the uses of property consistently with the Constitution is not a question for pure abstract theory alone.   Traditions and the habits of the community count for more than logic." *Laurel Hill Cemetery* v. *San Francisco,* 216 U. S. 358, 54 L. Ed. 515, 30 Sup. Ct. 301.

*Nelson* v. *Minneapolis,* (Minn.) 127 N. W. 445, 29 L. R. A. (N. S.) 260, involved the validity of an ordinance authorizing the summary seizure and destruction of milk not conforming to the standard fixed by law.   It was argued that before destroying the milk the authorities should be required to ascertain whether it was, in fact, unwholesome and unfit for food; and that to permit the destruction without regard to this question would amount to taking property without compensation and without due process.   The court, however, declined to adopt this view, and held that the  ordinance was not violative of the constitutional right of property, nor a taking without due process.

The riparian owner's right to bathe in the waters on which

his land borders is no more sacred or any different in kind than his right to fish therein. Both are property rights; both are exclusive. Yet in the exercise of the police power the Legislature may regulate the time and manner in which the right to fish, even on one's own land, shall be exercised, so as to subserve the common good. *State* v. *Theriault*, 70 Vt. 617, 41 Atl. 1030, 43 L. R. A. 290, 67 Am. St. Rep. 695. And as was pointed out in that case, in *Livermore* v. *Jamaica*, 23 Vt. 361, it was said that the taking of one's land for a public highway is not such a taking as requires a money compensation,—the benefit secured to the owner by such public improvement being sufficient therefor.

*Dunham* v. *New Britain*, 55 Conn. 378, 11 Atl. 354, was a suit for an injunction to restrain the enforcement of an ordinance prohibiting boating, sailing and fishing on Shuttle Meadow Lake, which was the source of the defendant's water supply. The lands on which this reservoir was created were deeded to the Borough of New Britain (to whose rights the defendant city succeeded) by the orator and his father. At the same time by a separate document, the water commissioners attempted to grant to the Dunhams the right "to sail on said pond and take fish therefrom at all times; said privilege not to be enjoyed by them exclusively, but to secure to them in common with the grantors and such other persons as said grantors shall license during their natural lives." Afterwards the Dunhams established a pleasure resort on the shore of the Lake and carried on a profitable business renting boats to pleasure seekers. It was found that the "use of the waters of the lake for boating, sailing and fishing is not in itself injurious, not a nuisance, and the agitation of the surface of the water is beneficial; but as a necessary incident to or concomitant of such use, a considerable quantity of impure and objectionable and decayed and decomposing matter, filth and various excreta of the human body, is from day to day deposited in the water of the lake. But such deposit has not been, and is not at present, in sufficient quantities to be appreciable in its effect upon the water, but the knowledge on the part of the public of such deposit produces disgust and tends to prevent the use of the water by the public for domestic purposes." The enforcement of the ordinance

reduced the profit of the orator's business and substantially impaired the value of his property. The validity of the ordinance was one of the principal points argued. After calling attention to the fact that the assignments of error restricted the questions for review, the court said: "To prevent the possible implication that it might have been better for the plaintiff had these matters been assigned for error, we will say in passing that in our opinion the decision of the court upon these points upon the facts as found was correct. The ordinance, having for its object the preservation of the public health and being adapted to that object, and having been authorized by the Legislature, was a proper and valid exercise of the police power of the state;      *   *   *      ".

*State* v. *Wheeler*, 44 N. J. L. 88, was a prosecution for violating an act prohibiting the pollution of the waters of any creeks, ponds or brooks, used for a public water supply. In affirming a conviction, it was held that the offence was complete when the waters were contaminated at the point where the objectionable matter was deposited, although the impurity did not in fact appreciably affect the waters when arrived at the reservoir. That so construed the act was not unconstitutional. That although it might limit the beneficial use of private property it was a valid exercise of the police power. "Nor is there anything," says the court, "to render such legislation objectionable because in some instances it may restrain the profitable use of private property when such use in fact does not directly injure the public in comfort or health. For to limit such legislation to cases where actual injury has occurred, would be to deprive it of its most effective force. Its design is preventive, and to be effective it must be able to restrain acts which tend to produce public injury."

These conclusions were approved in *State* v. *Diamond Mills Paper Co.*, (N. J.) 51 Atl. 1019.

*State* v. *Griffin*, (N. H.) 39 Atl. 260, 41 L. R. A. 177, was a prosecution of a riparian owner for depositing sawdust in a tributary of Lake Massabesic, which is the source of the water supply of the city of Manchester. Upon a full consideration, it was held that the prohibition was a valid exercise of the police power and the conviction was sustained.

*Durham* v. *Eno Cotton Mills*, 141 N. C. 615, 54 S. E. 453, 7 L. R. A. (N. S.) 321, was an appeal from a decree enjoining the pollution of Eno River, from which the plaintiff city took its water supply. It was held that it was not an infringement of the Constitutional rights of a riparian owner for the Legislature to prevent the pollution of a river from which a public water supply is taken, although no actual injury to the public health or comfort is shown.

*Miles City* v. *Board of Health*, (Mont.) 102 Pac. 696, 25 L. R. A. (N. S.) 589, was a proceeding to annul an order of the State Board of Health, made pursuant to statutory authority, prohibiting the city from discharging unpurified sewage into Yellowstone River, from which the city of Glendive took its water supply. It was held that the prohibition was a proper exercise of the police power, and that the validity of the board's order was unaffected by the fact that the intake of Glendive's system was so far below the outfall of the Miles City sewer that no pollution actually reached it.

Turning again to the case in hand we are not satisfied and cannot say that the regulation prohibiting bathing in Berlin Pond was a palpable violation of the respondent's rights, nor can we, from the record aided by facts of which we may take judicial notice, say that such prohibition was unnecessary or unreasonable. On the contrary we take notice of the germ theory of disease, and that the human body may give off germs dangerous to the public health; and that should these reach the intake of the water supply, they might, as suggested by the State Board, spread contagion throughout the city.

Our conclusion is that upon principle and authority the action of the State Board of Health was not only a wise but a valid exercise of the police power, lawfully delegated to the Board, and that the respondent's conviction must stand.

*There is no error and the respondent takes nothing. Let execution be done.*